EVANS LABORATORIES, Inc. *v.*
D. O. MELDER and Louis CINGOLANI

77-185                                                    562 S.W. 2d 62

Opinion delivered February 27, 1978
(In Banc)

*Spitzberg, Mitchell & Hays,* for appellant.

*Gill, Johnson & Burns,* for appellees.

FRANK HOLT, Justice. Pursuant to restrictive covenants contained in an employment contract, the appellant sought to enjoin the appellees, its former employees, from "accepting, soliciting, diverting or appropriating or continuing to service" any former customers of appellant's which were serviced by the appellees during their tenure of employment with appellant. After a hearing, a preliminary injunction was issued which prohibited appellees' solicitation of former customers but not appellees' acceptance of business from them if without solicitation. After an evidentiary hearing, the court found the employment contracts did not relate to the sale of a business; no trade secrets or confidential information were involved; the geographical limitations were unreasonable and incapable of reasonably definite location; and the court then concluded that the restrictive covenants were invalid and dissolved the previous injunction. We first con-

sider appellant's assertion that "[t]he restrictive covenants contained within the contracts are valid and enforceable under the laws of the State of Arkansas, said covenants being reasonably related to the needs of the appellant and restrictive only of competition which is unfair and not of competition which is fair."

Appellant, which is in the termite and pest control business, employed appellee Melder as its branch manager of their McGehee office. Appellee Cingolani worked as a routeman servicing customers in that area. Appellees' employment contracts were for an unspecified length of time and could be terminated by either party upon ten days' notice. The contract provided that acceptance of solicitation of business from appellant's customers, serviced by appellees while appellant's employees, was prohibited for a period of two years after the termination of appellees' employment. Appellant concedes that this provision is inapplicable to appellee Melder, because, as a branch manager, he serviced no former customers. Appellees left appellant's employment and went into business as the Delta Pest Control. Since that time, appellant lost approximately 278 out of the 307 customers formerly serviced by appellee Cingolani on his route. However, Cingolani stated that only about 125 to 150, or one-half, of the customers presently serviced by him were formerly on his route while working for appellant. There is no proof of solicitation by either of the appellees. In fact, the proof is to the contrary. Appellant correctly states the central issue to be resolved on appeal is the validity of the restrictive covenants.

The validity of a restrictive covenant not to compete in an employment contract depends upon the facts and circumstances of the particular case. *United Ins. Agency, Inc.* v. *Martin*, 258 Ark. 916, 529 S.W. 2d 871 (1975); and *McLeod* v. *Meyer*, 237 Ark. 173, 372 S.W. 2d 220 (1963). Further, it is well established that we are reluctant to uphold employment contracts which have negative provisions, as here, with reference to future employment elsewhere by the employee. *McLeod* v. *Meyer, supra.*

Appellees argue that the covenant in question here is invalid because, due to the two year length of the prohibition

and the prohibition on acceptance as well as solicitation, it constitutes a restraint of trade which is void as against public policy. Even so, appellant asserts that the covenant would only have the effect of prohibiting appellee Cingolani from soliciting or servicing customers whom he formerly serviced for appellant. Other Delta employees could do the actual servicing of those former customers. Appellant argues this prohibition is necessary because the relationship between the routeman and the customer is the most important element in developing and maintaining business in this industry. It appears that no trade secrets are involved.

In determining whether or not a restraint of trade imposed by a contract is reasonable, we consider "whether it is such only as to afford a fair protection to the interests of the party in whose favor it is given, and not so large as to interfere with the interests of the public." *Orkin Exterminating Co.* v. *Murrell,* 212 Ark. 449, 206 S.W. 2d 185 (1947); and *Edgar Lumber Co.* v. *Cornie Stave Co.,* 95 Ark. 449, 130 S.W. 452 (1910). Here the record indicates that when appellant's prior customers defected from it to Delta, the newly organized firm, it was not due to any solicitation on appellee Cingolani's part but due to their satisfaction with his prior servicing.

In the circumstances we are of the view that the provision which prohibits Cingolani from accepting the requests of appellant's former customers, whom he formerly serviced, is undue interference with the interests of the public's right to the availability of a serviceman it prefers to use. In other words, it results in an unreasonable restraint of trade. We deem it unnecssssary to discuss appellant's contention that the geographic restrictions in the contract are valid.

Affirmed.

FOGLEMAN, J., dissents.

HICKMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, dissenting. The court's reluctance to uphold a contract having negative covenants with reference to future employment has led it up a one-way

blind alley from which it cannot see the basic purpose for these covenants and the legitimate right of an employer to protect himself against unfair competition. By so doing, employers are deprived of their right to contract to protect themselves from business piracy. I feel so strongly that it is high time this court reexamine the posture it has taken in these cases, that I am compelled to voice those feelings, even though time will not permit elaboration to the extent I would like.

It appears to me that the view of employment contract covenants not to compete taken by this court over the last thirty years clearly indicates that the basic reasons for permitting these contracts in restraint of trade at all has become obscured. Originally at common law, no such contract was enforceable. 54 Am. Jur. 2d 958, Monopolies, Restraints of Trade & Unfair Trade Practices, § 511; Annot. 43 ALR 2d 94, 115. Later development produced the rule that a general restraint was invalid, but a partial restraint was valid, recognizing that a purchaser of a business or an employer was entitled to protection, not from competition, but from unfair competition, or business piracy. Annot. 41 ALR 2d 15, 69; 43 ALR 2d 94, 115, 117; 6A Corbin on Contracts 89, § 1394. Ultimately, the rule of partial restraint gave way to the rule of reasonableness, i.e., reasonable restraints are to be enforced. 54 Am. Jur. 2d 959, 982, Monopolies, Restraints of Trade & Unfair Trade Practices, §§ 512, 543; Annot. 43 ALR 2d 94, 115, 123. See *Orkin Exterminating Co. of Arkansas* v. *Murrell,* 212 Ark. 449, 206 S.W. 2d 185. The test of reasonableness turns on the facts and circumstances of the particular case, and that rule has been recognized ceremonially by this court. *United Insurance Agency* v. *Martin,* 258 Ark. 916, 529 S.W. 2d 871; *McLeod* v. *Meyer,* 237 Ark. 173, 372 S.W. 2d 220; *Bailey* v. *King,* 240 Ark. 245, 398 S.W. 2d 906; *McCumber* v. *Federated Implement & Hardware Ins. Co.,* 230 Ark. 13, 320 S.W. 2d 637. Perhaps no better test could be provided, because in every case there is a clash of two important freedoms, freedom to contract and freedom to work. See Annot. 41 ALR 2d 15, 53; 43 ALR 2d 94, 116, 142.

An interesting commentary on this history is found in *Arthur Murray Dance Studios of Cleveland* v. *Witter,* 62 Ohio L. Abs. 17, 105 N.E. 2d 685 (1952). That court said:

Over five hundred years of colorful history look down on this type of litigation. In the year 1415 Henry V was king. Skill in a trade was the vital factor in a man's economic status and it was obtainable only through apprenticeship to an experienced worker. The guild system permitted a man to work only in the trade in which he was apprenticed. Membership in a guild was not easily attained. Travel was difficult. Strangers were not welcome. If a man couldn't work at his trade in his particular locality, he could hardly work at all; might become a pauper; and the public would be deprived of a worker at a time when the Black Death had made workmen scarce. In that background when, in 1415, the celebrated Dyer's Case (Y.B. 2 Henry V, pl. 26) came before Judge Hall (Hull?), he became so enraged by an attempt to restrain a dyer from working a town for just half a year that in bad French he cursed the deal void: "By God, if the plaintiff were here he should go to prison until he paid a fine to the king." 28 Colum. L. Rev. 81, 82-83; 6 Corbin on Contracts 527, Sec. 1395; *Lange* v. *Werk*, 2 Ohio St. 519, 526-527.

Pounded by the pressures of social, economic, industrial, communication and transportational change, the law has changed (7 U.T. Toronto L.J. 413-415; 26 Cornell L.Q. 707, 708-709; 31 Ia. L. Rev. 249-251; 36 Am. Jur. 530, Sec. 50; 5 Peabody L. Rev. 80-82) until today, as a rough rule of thumb, the law is that a covenant restraining an employee, on termination of employment, from competing with his former employer, is valid if it is reasonable in view of all the circumstances of the particular case. 13 U. Detroit L.J. 25, 27; 90 U. Pa. L. Rev. 855, 856; 33 Harv. L. Rev. 320; 31 Ia. L. Rev. 249, 253; 32 Marq. L. Rev. 282, 283; 5 Williston on Contracts 4580, § 1636; 36 Am. Jur. 532, § 51; 3 Pomeroy's Equity Jur. 689, § 934 C.

I take issue with the emphasis that has been placed upon the absence of trade secrets.[1] I submit that this is only a matter to be considered. An employer may prevent an

---

[1]There is respectable authority that area is the most important single element of the covenant and that it has an important bearing on the question of enforceability. Annot. 43 ALR 2d 94, 106, Restatement of the Law,

employee from disclosing trade secrets without any contract or covenant. 87 CJS 407, Trade-Marks, Trade-Names & Unfair Competition, § 121; 55 Am. Jur. 28, Monopolies, Restraints of Trade & Unfair Trade Practices, § 704. It is widely recognized that the most important of the legitimate interests of the employer which are entitled to protection is the stock of customers he has been able to develop. Annot. 41 ALR 2d 15, 35, 69, 71; 43 ALR 2d 94, 117, 162. See also, 17 CJS 1141, Contracts § 254. It is the personal relationship existing between the employee and the customers of the employer which has to be taken into account as indicating the likelihood that the employee when leaving might be able to take his employer's customers with him. This depends upon the extent to which the customer identifies him with the business in hand and replaces the contact he would otherwise have with the employer, which is likely when the employee is the main, if not the sole, contact of the employer with the customer.[2] Annot. 41 ALR 2d 15, 35, 72; 43 ALR 2d 94, 117; 6A Corbin on Contracts 100, § 1394; *Masden* v. *Travelers' Ins. Co.*, 52 F. 2d 75, 79 ALR 469 (8 Cir., 1931). The annotator in the annotation first cited finds that the protection of trade or business secrets and special knowledge is a no less important legitimate interest of the employer. 41 ALR 2d 15, 37. Customer lists are generally taken in other states to be confidential information sufficiently important to warrant protection. 41 ALR 2d 15, 37; 43 ALR 2d 94, 118, 191. It is significant to me that the majority continues to emphasize *Orkin Exterminating Co.* v. *Murrell*, 212 Ark. 449, 206 S.W. 2d 185, because that case, in spite of what has been said about it in later cases, turned upon the fact that not only trade secrets, but special training and confidential information were involved. The court, after having stated that there was special training in the business the employer was conducting and on the proper use of chemicals in that business, also stated that the employee "had access to all records, customer lists and credit rating." An annotator has stated the matter thus:

Now, what are the special facts, either one or more of which must be present in order to make a restrictive

Contracts, § 515, Comment c. Not long ago, this court said that the most important factors are time and area. *All-State Supply Co.* v. *Fisher,* 252 Ark. 962, 483 S.W. 2d 210.

[2]This was certainly the situation in this case.

covenant relating to entering into competitive business reasonable? The courts are quite well agreed as to what they are, although not always enumerating all of them, or in the same way. Generally speaking they are (1) special influence obtained by the employee during the course of his employment with the customers of the employer; (2) the possession by the employer of trade secrets, communicated to the employee during the course of his services or of confidential information not amounting to trade secrets in the strictest sense of the word; (3) and in a much lesser degree than in the two preceding factors, the acquisition of experience or skill by the employee during his employment.

Furthermore, it is generally recognized that the right of an employer to keep his trade or business secrets for himself and to retain the advantage of such special knowledge as he may possess of names and special needs of potential customers is subject to protection by a restrictive covenant. Annot. 41 ALR 2d 15, 102; 43 ALR 2d 94, 118, 185; 6A Corbin on Contracts 97, § 1394.

The concept of reasonableness is broken down into three separate and distinct elements, i.e., reasonableness as to the employer, reasonableness as to the employee and reasonableness as to the public. Annot. 41 ALR 2d 15, 54; 43 ALR 2d 94, 116, 144. The first and most important of the three is reasonableness as to the employer, the party in whose favor the covenant is given. Annot. 41 ALR 2d 15, 61, 67; 43 ALR 2d 94, 117, 151. See *Orkin Exterminating Co.* v. *Murrell,* supra.

The rules governing such contracts are flexible, and, if the public welfare is not involved, and the restriction on the employee is no greater than protection to the other party requires, the contract may be sustained. 3 Pomeroy's Equity Jurisprudence 688, § 934c. There is no hard and fast rule as to what contracts are void, and each case must be judged according to its own facts and circumstances. *Robbins* v. *Plant,* 174 Ark. 639, 297 S.W. 1027, 59 ALR 1128. Such a covenant is reasonable, where there is no public injury, "if it is such only as to afford fair protection to the party in whose favor it is given," and the employee is not deprived of his means of

making a living. *Edgar Lumber Co.* v. *Cornie Stave Co.*, 95 Ark. 449, 130 S.W. 452; *Bailey* v. *King,* 240 Ark. 245, 398 S.W. 2d 906.

A review of some of the facts in this case will demonstrate the reasons I feel so strongly that the legitimate interests of the employer are not outweighed by the interests of the public, insofar as appellee Cingolani is concerned. I agree that the contract with Melder is unenforceable for reasons I find unnecessary to state.

Cingolani was a route man and service technician who serviced particular customers. He terminated his employment on January 30, 1976, four days after Melder had terminated his contract. Cingolani's agreement contained a covenant that he would not accept, solicit, divert, appropriate, or attempt to accept, divert or appropriate any customers in a specified area who were customers of appellant during his employment or who were served or called upon by him pursuant to his employment.

Immediately upon termination, Melder and Cingolani went into a new company then formed to perform the identical service being performed by appellant and in an area from which appellant drew a substantial part of its business and employed three other former employees of appellant. Appellant sought an injunction to enjoin Cingolani from accepting, soliciting, diverting or appropriating or continuing to service customers of appellant in the territory covered by the employment contract for the purpose of selling or rendering pest control services.

Appellant's president testified that a new serviceman is not worth his salt until he has worked for the company for six months and that it will take four to six months for him to establish a relationship with a customer. The importance of this relationship, he said, is due to the fact that the serviceman is the company's only contact with the customer. He said the cost of changing a serviceman on a route was $2,000 and that of 307 customers on Cingolani's route on January 26, 1976, appellant had lost 278, which meant a revenue loss of $27,393. The company's normal attrition rate was 3% to 4%. Appellant had raised its prices in 1975, effective in July

and September. There was only one price increase, however. The new company established service rates below appellant's prices. According to the secretary of the branch office of appellant, price increases normally resulted in the loss of six to eight customers. Melder testified that the attrition rate was 25% to 30%, or more if prices were increased. The testimony on behalf of appellant was not otherwise substantially contradicted.

Cingolani admitted that he was at the time of the trial servicing approximately 192 of the customers he had serviced when employed by appellant.

Cingolani would only be restrained from servicing customers he had serviced while employed by appellant and who remained within the area designated. Thus the restraint would apply to a very small segment of the public. Cingolani's customers while employed at Delta could do business with the new firm if they were serviced by a routeman other than Cingolani and Cingolani could not serve them or solicit their business. There was evidence that there was a substantial number of prospective customers in the area who were not receiving this service from anyone. Both Melder and Cingolani had a wide acquaintance in the area.

The restrictions on Cingolani could not greatly interfere with the interests of the public.

This court has only recently recognized and applied the principles that should govern here. In *Borden, Inc.* v. *Huey*, 261 Ark. 373, 547 S.W. 2d 760, we said:

*** Many decisions in other states have recognized the importance of such "customer-contract" by employees. "The most important single asset of most businesses is their stock of customers. Protection of this asset against appropriation by an employee is recognized as a legitimate interest of the employer. A restrictive covenant, therefore, fulfills the first requirement on which its enforceability depends, if it is necessary to protect the employer against loss of his customers." Annotation, 41 A.L.R. 2d 15, 71 (1955). The annotator goes on to point out that an employer is especially vulnerable when an

employee, such as a route man, deals with customers away from the employer's place of business and builds up personal relationships that bind the customers to himself instead of to the employer's business. That reasoning applies to the case at bar, Huey having been an outside salesman for Borden.

Oddly enough, the majority tacitly, but perhaps unwittingly, points up the importance of the customer-serviceman relationship by saying that the record indicates that the defection of appellant's prior customers was due to their satisfaction with Cingolani's prior servicing. Yet the majority does not attempt to explain why it gives no consideration to this fact in relation to the employer's legitimate interest or why it did not have the same impact given it in *Huey*.

I would reverse the decree and direct the entry of an appropriate injunction against Cingolani.